**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-2214-23
A-2293-23

STATE OF NEW JERSEY,

Plaintiff-Respondent,

v.

GREGORY HARRIS,

Defendant-Appellant.

_____

Submitted December 9, 2025 – Decided February 17, 2026

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 04-01-0055.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Andrew B. Johns, Gloucester County Prosecutor, attorney for respondent (Michael C. Mellon, Assistant Prosecutor, on the brief).

PER CURIAM

These consolidated appeals have a complex and lengthy procedural history arising out of defendant Gregory Harris' 2005 convictions and sentence for attempted robbery and murder of one victim, the assault of another victim, and the shooting of two other victims, one of whom died. In a prior appeal, we remanded the matter for an evidentiary hearing to determine if defendant could show excusable neglect for filing a late direct appeal and for pursuing a late petition for post-conviction relief (PCR).

After conducting an evidentiary hearing, the PCR court found defendant demonstrated excusable neglect and should be allowed to pursue both a direct appeal and his PCR petition. The PCR court then considered defendant's petition but denied it after determining that defendant had not established ineffective assistance of trial counsel.

Defendant now directly appeals from his convictions and sentence. He also separately appeals from the order denying his PCR petition. We consolidated the appeals. Having reviewed the arguments, law, and record, we affirm defendant's convictions but remand for a new sentencing. We also affirm the order denying defendant's PCR petition because defendant failed to establish any prejudice.

A-2214-23

## I.

On August 29, 2003, defendant went to an apartment complex armed with a handgun. He confronted Lamar Young with whom he had previously had a fight and demanded that Young give him money. Young shielded himself behind a companion, Joseph Bluford, and Bluford tried to stop the confrontation. Defendant then struck Bluford in the head, knocking him out. Young fled and defendant fired multiple shots. Several bullets hit another bystander, Alexander Burgos, and Burgos died as a result of his gunshot wounds. Several other bullets hit another bystander, Dwayne Martin, and Martin was seriously injured. Defendant then fled the scene in a car driven by his cousin, co-defendant Whitney Harris.

In January 2004, a grand jury indicted defendant for fourteen crimes relating to the assaults and shootings. Those crimes included the first-degree murder of Burgos, N.J.S.A. 2C:11-3(a)(1), (2); first-degree felony murder of Burgos, N.J.S.A. 2C:11-3(a); second-degree aggravated assault of Martin, N.J.S.A. 2C:12-1(b)(1); first-degree attempted murder of Young, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; first-degree attempted robbery of Young, N.J.S.A. 2C:5-1 and 2C:15-1(a)(2); and fourth-degree assault of Bluford, N.J.S.A. 2C:12-1(b)(3), (4).

A-2214-23

A jury trial was conducted in January 2005. The State called numerous witnesses, including Young, Martin, Whitney Harris, and a forensic expert who had analyzed DNA from a baseball cap found at the scene of the shootings.

Young testified that he and defendant had a physical fight in early August 2003. Young told the jury he and defendant had fought several times that day, and he had twice knocked defendant unconscious.

About two weeks later, Young rode a bicycle to an apartment complex where a group of people were hanging out. Young recalled talking with Bluford, a friend, when he heard a bang. Young described how defendant shot at him, ran up to him, and told Young to give him all his money. Young testified he ran behind Bluford. Thereafter, Young escaped by running to the apartment complex and then riding away on his bike.

Martin testified that he was with defendant outside the apartment complex on the day of the shootings. He told the jury Young approached on a bicycle, defendant pulled out a gun, and defendant confronted Young asking him: "What's up now, grandpop," "What you got to donate," and "Are you ready to f'in die?" Martin explained that Bluford tried to calm defendant down, but defendant hit Bluford in the head with his gun, knocking him unconscious.

4

Martin went on to explain that defendant pointed the gun at Young and shot at him. After Martin heard the gunshot, he became lightheaded and noticed he had blood "gushing out" of his right arm. He ran off and collapsed.

During the altercation, Burgos, who was a bystander, was shot in the chest and later died. A witness who lived at the apartment complex testified she was friends with Young, Martin, Bluford, and Burgos. She recalls hearing gunshots and finding Burgos lying on the side of the building.

Defendant fled the scene in a vehicle driven by his cousin Whitney Harris. Whitney later entered a plea agreement on charges related to her participation in the events and agreed to testify against defendant. Whitney testified that defendant told her he had to "handle a problem" with Young, who he stated, "owed him some money." Whitney went on to explain that she went with defendant to the apartment complex and defendant fired the gun he had brought with him during the confrontation with Young. She also testified defendant asked Young, "Where my money at?"

When law enforcement personnel responded to the shooting scene, they found a baseball cap. At trial, Dr. Jennifer Hintz testified as a DNA expert for the State. Dr. Hintz told the jury defendant could not be excluded as a partial contributor to the mixed DNA profile found on the baseball cap.

After hearing all the evidence, the jury convicted defendant of ten of the fourteen counts. Specifically, defendant was convicted of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a); first-degree felony murder; second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-4(a); third-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b); second-degree unlawful possession of a handgun by a person who has previously been convicted of a crime, N.J.S.A. 2C:39-7; third-degree assault, N.J.S.A. 2C:12-1(b)(1); fourth-degree assault, N.J.S.A. 2C:12-1(b); first-degree attempted murder; and first-degree attempted robbery. Later that year, defendant was sentenced to an aggregate prison term of fifty-five years with periods of parole ineligibility and parole supervision as prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

II.

In May 2005, appellate counsel retained by defendant filed a timely notice of appeal. That appeal was later dismissed when defendant's appellate counsel failed to file a brief. Over the next several years, various counsel attempted to reinstate the appeal, but those applications were denied.

In October 2017, defendant, representing himself, filed a PCR petition. He claimed that appellate counsel had misled him about the status of his direct

appeal and he requested the right to file a direct appeal. Thereafter, defendant was assigned PCR counsel who assisted him in presenting his PCR petition.

On October 28, 2020, the first PCR court denied defendant's petition without an evidentiary hearing, reasoning that the petition was time-barred. Defendant appealed from that order and we reversed. See State v. Harris, No. A-0140-21 (App. Div. Jan. 4, 2023) (the 2023 Appeal).

In the 2023 Appeal, we determined that defendant had made a prima facie showing of excusable neglect for not having timely pursued the direct appeal and for filing his PCR petition beyond the five-year limitations period. Nevertheless, we also determined that there were factual assertions that needed to be established at an evidentiary hearing and, therefore, we remanded the matter for an evidentiary hearing. We directed that if defendant's PCR petition against his appellate counsel was deemed timely, then he would have a right to file a direct appeal. We also directed that if the PCR court determined defendant's petition was timely based on excusable neglect, the court was to evaluate and rule on the merits of defendant's claim of ineffective assistance of trial counsel. Id. at 25-26.

On remand, a different PCR judge conducted an evidentiary hearing. The second PCR court heard testimony from defendant's trial counsel, defendant's

appellate counsel, defendant, his mother, and his aunt.  Based on the testimony, the second PCR court found that defendant and his family had been misled by appellate counsel concerning the status of defendant's direct appeal.  The court then determined defendant had shown excusable neglect and his appeal should be deemed timely.

The second PCR court also found that defendant had shown excusable neglect for filing his PCR petition late and the petition should be considered on its merits.  In terms of ineffective assistance of trial counsel, defendant asserted his counsel had been ineffective in not arguing that Burgos was not shot during an attempted robbery of Young and, therefore, the State failed to establish a necessary element of felony murder.  Examining the testimony and evidence concerning that claim, the second PCR court found defendant failed to establish either of the two prongs of the Strickland/Fritz test.[1]  The court, therefore, denied defendant's PCR petition in an order entered on February 5, 2024.

---

[1]  Strickland v. Washington, 466 U.S. 668, 687 (1984); accord State v. Fritz, 105 N.J. 42, 58 (adopting the Strickland two-prong test)

III.

We first address defendant's direct appeal, in which defendant challenges his convictions, making six arguments. He also challenges his sentence as unfair and excessive. Defendant articulates those arguments as follows:

MULTIPLE TRIAL COURT ERRORS DENIED DEFENDANT A FAIR TRIAL.

(1) The trial court committed harmful error when it denied defendant's recusal motion.

(2) The trial court's denial of defendant's motion for a three-week adjournment to allow the defense to complete its investigation of the case was unfair and denied defendant his constitutional right to a vigorous and complete defense.

(3) The trial court erred by not instructing the jury on the lesser-included charge of passion-provocation manslaughter.

(4) The trial court's limitation on trial counsel's cross-examination of Whitney Harris denied defendant both his right to a complete defense and his Confrontation Rights.

(5) The trial court erred when it denied defendant's motion for a mistrial after he was depicted on a video in prison garb.

(6) The trial court's cumulative errors denied defendant a fair trial.

THE SENTENCE IMPOSED WAS MANIFESTLY UNFAIR AND EXCESSIVE.

A-2214-23

Initially, we address the unusual nature and timing of this direct appeal. We are satisfied that the record established that defendant retained appellate counsel and filed a timely direct appeal. The direct appeal was initially dismissed without fault by defendant. Following an evidentiary hearing, the second PCR court found that defendant was misled as to the status of his direct appeal, and he had shown excusable neglect in not pursuing the direct appeal before he filed his petition in 2017. Given our ruling in the 2023 Appeal, we therefore accept defendant's direct appeal at this time and treat it as if it was timely filed. We will, therefore, address each of defendant's contentions on their merits.

1. The Denial of Defendant's Motion to Recuse the Trial Judge.

Just before trial, defendant moved to recuse the trial judge contending that the judge had previously represented another individual named George Harris. There was no evidence that the George Harris who had been represented by the judge was related by blood to defendant; rather defendant claimed he had been named after the older Harris and was "adoptive son" to Harris, Sr. Defendant's counsel conceded there was no prejudice; rather defendant was contending that there was an appearance of partiality.

The trial judge denied the motion, holding that there was no reasonable appearance of impropriety or partiality. The judge explained that he represented a young man named George Harris over twenty-five years before on traffic violations. He also explained he had no contact with his former client or his former client's family for over twenty-five years.

Judges should "'refrain . . . from sitting on any causes where their objectivity and impartiality may fairly be brought into question.' In other words, judges must avoid acting in a biased way or in a manner that may be perceived as partial." Amato v. Twp. of Ocean Sch. Dist., 480 N.J. Super. 239, 246 (App. Div. 2024) (emphasis omitted) (quoting DeNike v. Cupo, 196 N.J. 502, 514 (2008)). The relevant inquiry is "whether a reasonable person would doubt the judge's impartiality, given the judge's" prior actions. Id. at 248. In other words, the standard is "[w]ould a reasonable, fully informed person have doubts about the judge's impartiality?" State v. McCabe, 201 N.J. 34, 45 (quoting DeNike, 196 N.J. at 517).

"[R]ecusal motions are 'entrusted to the sound discretion of the judge and are subject to review for abuse of discretion.'" Amato, 480 N.J. Super. at 245 (alteration in original) (quoting Goldfarb v. Solimine, 460 N.J. Super. 22, 30

(App. Div. 2019)). "Motions for recusal ordinarily require a case-by-case analysis of the particular facts presented." McCabe, 201 N.J. at 46.

We are fully satisfied that the trial judge did not abuse his discretion in denying defendant's motion to recuse. Defendant did not establish he had a blood relationship with the other George Harris who the trial judge had represented over twenty-five years before. More to the point, no reasonable person would think that the trial judge had any impartiality given that he had represented another George Harris over twenty-five years ago and had no contact with his prior client since that time.

Defendant's reliance on State v. Dalal, 221 N.J. 601 (2015), is misplaced. In Dalal, the Court dealt with a situation where the defendant had allegedly made death threats against two judges in a particular county, and the question was whether other judges in that same county should be disqualified from hearing the matter. Id. at 603-04. Determining that the defendant in Dalal was not attempting to manipulate the judicial system by engaging in forum shopping, that Court disqualified the other county judges from involvement in the matter to avoid any appearance of partiality. Id. at 609. The facts here are completely distinguishable.

2.    The Adjournment Request.

On January 10, 2005, the first day of trial, defendant moved for a three-week adjournment. He sought time to (1) retain a DNA expert to analyze the baseball cap found at the scene; (2) to obtain defendant's hospital records related to the altercation with Young a few weeks prior to the shootings; and (3) to obtain a response for a subpoena he had issued to the Violent Crime Compensation Board for records related to Martin.

The trial court denied that request, noting that defendant had ample time to obtain all the information before trial. The court also pointed out that in October 2024, the matter was first scheduled for trial in December 2024, and thereafter it had been adjourned several times to January 2025. Looking at the substance of the requests, the court found the State had supplied the DNA material in September 2024, and defendant had time to analyze the DNA material. The court also pointed out that if defense counsel needed additional time after hearing from the DNA expert, the court would consider an application. Addressing defendant's medical records, the court pointed out that those records were available for a substantial time before trial and there was no showing of a need for an adjournment. The court applied similar reasons regarding the request for more time to obtain the Board records concerning Martin.

A-2214-23

We review a trial court's denial of an adjournment for an abuse of discretion. State v. Miller, 216 N.J. 40, 47 (2013). "New Jersey long has embraced the notion that '[a] motion for an adjournment is addressed to the discretion of the court, and its denial will not lead to reversal unless it appears from the record that the defendant suffered manifest wrong or injury.'" State v. Hayes, 205 N.J. 522, 537 (2011) (quoting State v. Doro, 103 N.J.L. 88, 93 (E. & A. 1926)). Moreover, the denial of an adjournment request will only lead to a reversal if there is a showing of prejudice. Miller, 216 N.J. at 47.

Here, there is no showing of an abuse of discretion or prejudice. The record establishes that defendant had been indicted eighteen months before the trial and that he had ample time to prepare for trial. Just as importantly, defendant has made no showing of prejudice. The DNA analysis was not a significant part of the evidence leading to defendant's conviction. Defendant has also made no showing of how his medical records or records concerning Martin would have been relevant to his defense.

3.    The Lesser Included Jury Charge.

At the charge conference, defense counsel requested a charge for passion/provocation in relationship to the charges of murder and felony murder.

14

The trial judge denied that request finding that there were insufficient facts to support either a provocation or lack of time of cooling off from the provocation.

When as here, the defendant has requested a lesser included offense, including passion/provocation manslaughter, "the trial court must include it if, viewing the evidence in the light most favorable to the defendant, there is a 'rational basis in the record for doing so.'" State v. Canfield, 252 N.J. 497, 501 (2023) (quoting State v. Denofa, 187 N.J. 24, 42 (2006)); see also State v. Owens, 262 N.J. 391, 392 (2026) (clarifying that the "rational basis in the record" standard is the appropriate standard in considering whether to include a passion/provocation manslaughter charge when requested).

A passion/provocation manslaughter instruction is appropriate when the facts demonstrate four elements:  "'[1] the provocation must be adequate; [2] the defendant must not have had time to cool off between the provocation and the slaying; [3] the provocation must have actually impassioned the defendant; and [4] the defendant must not have actually cooled off before the slaying.'"  State v. Morente-Dubon, 474 N.J. Super. 197, 210 (App. Div. 2022) (alterations in original) (quoting State v. Carrero, 229 N.J. 118, 129 (2017)).  There must be objective evidence to support the first two elements and that evidence should be

considered from the perspective of a reasonable person. Carrero, 229 N.J. at 129; State v. Rambo, 401 N.J. Super. 506, 515 (App. Div. 2008).

In this matter, there was no rational basis in the record that defendant had not had time to cool off between the provocation and the shootings. Defendant argued that he was still impassioned because of the fight he had with Young in early August 2003. The evidence at trial, however, established that more than two weeks had passed between that fight and the shootings. There was also evidence that defendant went to Philadelphia after the fight to obtain a gun and then with the passage of more time had a friend drive him to the apartment complex where the shootings took place. See State v. Owens, ___ N.J. Super. ___, ___ (2024) (slip op. at 3, 6) (Gilson, P.J., dissenting), rev'd on dissent, 262 N.J. 391 (2026) (explaining that a defendant who drove around for forty minutes before shooting the victim was not entitled to a passion/provocation jury instruction).

4.     The Cross Examination of Whitney Harris.

Next, defendant argues that the trial court limited his cross-examination of co-defendant Whitney Harris regarding the terms of her plea agreement. The record and law do not support defendant's argument.

The Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution provide that a defendant in a criminal prosecution has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; State v. Jackson, 243 N.J. 52, 65 (2020) (explaining that the Confrontation Clause "guarantee[s] the right of defendants to confront the witnesses against them"). "The Confrontation Clause permits a defendant to explore, in cross-examination, a prosecution witness['] alleged bias." State v. Bass, 224 N.J. 285, 301 (2016). Accordingly, "[i]t is 'fundamental' that a defendant has a right to explore evidence tending to show that the State may have a 'hold' of some kind over a witness, the mere existence of which might prompt the individual to color his [or her] testimony in favor of the prosecution." State v. Parsons, 341 N.J. Super. 448, 458 (App. Div. 2001) (quoting State v. Holmes, 290 N.J. Super 302, 312 (App. Div. 1996)). The scope of that cross-examination right includes the right of the defense to explore the pendency of charges or an investigation related to prosecution against a witness for the State. Bass, 224 N.J. at 303.

Defendant argues that his counsel was limited in his ability to cross-examine Whitney Harris regarding municipal charges pending against her. The record does not support defendant's contentions.

17

On cross-examination, defense counsel was permitted to question Whitney Harris regarding her plea agreement with the State. Whitney explained that she had been charged with conspiracy to commit murder and hindering her apprehension. She also explained that she was exposed to seven to ten years in prison for the conspiracy charge and five years in prison for the hindering charge. Additionally, she stated that as part of her plea agreement she would only be sentenced to probation, provided she testified against defendant.

Defense counsel then began to question Whitney about her pending municipal court charges and the State objected. At a sidebar, counsel and the judge discussed the relevance of the municipal charges and whether they were part of the plea agreement, including a downgrade of charges to municipal court. The judge pointed out that the downgrade was not mentioned in the plea agreement itself but allowed defense counsel to question Whitney about her understanding of the plea agreement and whether it involved any downgrades of indictable charges to municipal charges. Defense counsel then resumed his questioning of Whitney and asked:

> Q    What was your understanding of the plea agreement? What was the State giving you and what were you giving the State?

A     The State was going to give me probation but I didn't know I had to testify until after I already signed the paper.

Q     Was there anything else other than - -

A     I just know that I was supposed to get probation. That's all I know.

Defense counsel then asked for another sidebar. At the sidebar, defense counsel explained that he wanted to question Whitney about a "long disorderly persons history" and suggested that that history might be "part of the consideration and part of her basis for entering into the agreement[.]" The State objected but the trial judge never expressly limited defense counsel's cross-examination. Following that sidebar, the defense counsel continued its examination of Whitney but did not try to explore her petty disorderly persons record.

Appellate courts review decisions about the permissible scope of cross-examination for abuse of discretion. State v. Higgs, 253 N.J. 333, 361 (2023) (citing State v. Silva, 131 N.J. 438, 449 (1993)). If a court's decision to limit cross-examination was an error, an appellate court must then consider whether the error was harmless. Jackson, 243 N.J. at 72. In considering whether an error is harmless, the court considers "whether the 'error [was] sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not

have reached.'" Id. at 73 (alterations in original) (quoting State v. Prall, 231 N.J. 567, 581 (2018)).

Here, we discern no reversible error. The cross-examination of Whitney does not reveal that the trial judge expressly limited defense counsel's scope of cross-examination. Defense counsel was permitted to fully explore the plea agreement Whitney had worked out with the State and the jury was made aware that Whitney was receiving a substantial reduction in her potential fifteen-year sentence to probation. Consequently, to the extent that the defense counsel was using that to undercut Whitney's credibility, the point was made.

Moreover, to the extent that there was any limitation, it was harmless. As we just pointed out, the jury understood that Whitney was receiving a substantial benefit from the State and it could evaluate her testimony based on the plea agreement she had negotiated with the State. Moreover, several other witnesses, including Young, and Martin confirmed and substantially corroborated the testimony provided by Whitney. In short, defendant has shown no reversible error occurred during the cross-examination of Whitney Harris.

5.    The Motion for Mistrial.

During jury deliberations, the jury requested a playback of testimony from two witnesses. Apparently, as that video recording was played, defendant was seen in prison attire. No objection was made at the time.

The following day, defendant made a motion for a mistrial based on numerous contentions. Among those points, defense counsel argued that the jury was prejudiced by seeing defendant in prison attire. Defense counsel conceded that he had not actually seen that short excerpt of the video.

The trial court denied the motion for a mistrial. Concerning the video clip depicting defendant in prison attire, the court found that defendant was only shown in his attire for approximately three to five seconds and it was not clear that the jury even noticed the video clip. The court therefore found that there was no showing of prejudice and no grounds for a mistrial.

On this appeal, defendant argues that he was prejudiced when a short unredacted clip from a video depicted him in prison attire. The record does not support defendant's contentions. "Appellate courts 'will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

It is well-established that a jury should not see a defendant in prison attire, nor should the defendant be restrained unless there are exceptional circumstances. State v. Artwell, 177 N.J. 526, 535-36 (2003). When a defendant is shown in prison attire before the jury, the question is whether defendant was prejudiced. State v. Smith, 346 N.J. Super. 233, 239 (App. Div. 2002).

The record establishes that whatever was shown on the video was only displayed for a matter of seconds. Nothing in the record establishes that the jury actually saw defendant depicted in prison attire. Just as importantly, nothing in the record establishes that defendant was prejudiced in any way. Accordingly, we can discern no abuse of discretion and no grounds for a reversal based on this argument.

6.    Alleged Cumulative Errors.

In his last challenge to his convictions, defendant argues that even if all his other arguments individually do not warrant reversal, cumulatively they do.

The cumulative error doctrine provides that when a combination of errors "casts doubt . . . on the propriety of the jury verdict" and "prejudice[s] the fairness of defendant's trial," reversal may be warranted. State v. Jenewicz, 193 N.J. 440, 473-74 (2008). In other words, defendant is entitled to a fair trial and

22

when multiple errors collectively undermine fairness, a new trial will be required. State v. Reddish, 181 N.J. 553, 615 (2004). Conversely, "'the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair.'" State v. T.J.M., 220 N.J. 220, 238 (2015) (quoting State v. Weaver, 219 N.J. 131, 155 (2014)).

Here, we discern no cumulative errors warranting a reversal of defendant's convictions. As we have analyzed, each of defendant's arguments individually fail. Indeed, most of them are not supported by the record and law. To the extent that there were any errors, they were harmless and in combination they did not result in an unfair trial.

7.    Defendant's Sentences.

Defendant contends his sentences were manifestly unjust and excessive. He argues the trial court did not explain why certain aggravating factors were applicable and why no mitigating factors were found. He also argues the sentencing judge did not apply the Yarbough factors for imposing consecutive sentences and did not provide a statement of the overall fairness of the sentences.

An appellate court's standard of review of a sentence is well-established and deferential. State v. Cuff, 239 N.J. 321, 347 (2019) (citing State v. Fuentes, 217 N.J. 57, 70 (2014)). We will affirm a trial court's sentence unless: "(1) the

sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence." N.J.S.A. 2C:44-5(a). In State v. Yarbough, 100 N.J. 627, 643-44 (1985), our Supreme Court established criteria that a sentencing court must consider when deciding whether to impose consecutive sentences. Namely, the court must evaluate whether:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;

[Id. at 644.]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." Cuff, 239 N.J. at 348 (first citing State v. Molina, 168 N.J. 436, 442-43 (2001); and then citing State v. Carey, 168 N.J. 413, 427-28 (2001)).

When a sentencing court fails to explain its decision to impose consecutive sentences, a remand is generally required for the judge to provide an explanation on the record. State v. Miller, 205 N.J. 109, 129 (2011). The Supreme Court has emphasized this principle and explained:

> In sum, while the Code is animated by the overarching goal of ensuring "a predictable degree of uniformity in sentencing," uniformity and predictability should not come at the expense of fairness and proportionality. We reiterate the repeated instruction that a sentencing court's decision whether to impose consecutive sentences should retain focus on "the fairness of the overall sentence." Toward that end, the sentencing court's explanation of its evaluation of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis."
>
> [State v. Torres, 246 N.J. 246, 270 (2021) (citations omitted).]

On March 24, 2005, defendant was sentenced for his convictions of ten crimes.[2] The sentencing judge summarily found aggravating factors one, "[t]he nature and circumstances of the offense," N.J.S.A. 2C:44-1(a)(1); two, "[t]he gravity and seriousness of harm inflicted[,]" N.J.S.A. 2C:44-1(a)(2); three, "[t]he risk that the defendant will commit another offense[,]" N.J.S.A. 2C:44-1(a)(3); six, "[t]he extent of the defendant's prior criminal record[,]" N.J.S.A. 2C:44-1(a)(6); and nine, "[t]he need for deterring[,]" N.J.S.A. 2C:44-1(a)(9).[3] The judge found no mitigating factors.

On his conviction for felony murder, defendant was sentenced to forty years in prison and on his conviction for attempted murder, defendant was sentenced to fifteen years in prison. Both those sentences were subject to NERA, and the sentences were run consecutively. All the other convictions were either merged, or the sentences were run concurrent to the felony murder and attempted murder sentences. Therefore, in aggregate, defendant was sentenced to fifty-five years in prison, subject to NERA.

---

[2] The judge heard further arguments on April 5, 2005, and entered the Judgment of Conviction (JOC) that same day.

[3] The judge did not discuss aggravating factor six on the record. Instead, he listed that factor in a statement attached to the JOC.

A-2214-23

The record does not allow us to assess the sentencing judge's findings of the aggravating factors and the lack of mitigating factors. In that regard, the judge provided no analysis and only cited one fact in support of aggravating factor three. Additionally, the sentencing judge did not expressly discuss and analyze the Yarbough factors and there was no discussion of the overall fairness of the sentences imposed. The judge merely stated consecutive sentences are an "appropriate means to protect society from those who are unwilling to lead a productive life. This defendant is not entitled to free crimes in the state of New Jersey." While the judge did attach statement of reasons for the sentences to the JOC, that statement provided no additional analysis.

Consequently, the judge's analysis fell short of the sentencing standards in three ways: (1) there were insufficient findings of facts supporting the aggravating factors and the lack of mitigating factors; (2) there was no analysis of the Yarbough factors; and (3) there was no analysis and explicit statement concerning the overall fairness of the sentences imposed. In Torres, the Court stated: "[a]n explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings, is essential to a proper Yarbough sentencing assessment." 246 N.J. at 268.

Therefore, we remand for a new sentencing. In doing so, we recognize the unique circumstances of this appeal. Defendant was sentenced over twenty years ago, but we are only now deciding his direct appeal. Because it is a direct appeal, and because we are remanding for resentencing, defendant is entitled to be viewed "as he stands before the court" on the day of resentencing. See State v. Randolph, 210 N.J. 330, 354 (2012). We express no opinion regarding the sentences the trial court should impose at the resentencing.

IV.

Next, we review defendant's appeal from the order denying his PCR petition. Where, as here, the PCR court conducted an evidentiary hearing, appellate courts review its factual and credibility findings under a deferential standard and will only reverse the findings if they are not supported by substantial credible evidence. State v. Gideon, 244 N.J. 538, 551 (2021) (quoting State v. Nash, 212 N.J. 518, 540 (2013)). Legal conclusions are reviewed de novo. State v. Hernandez-Peralta, 261 N.J. 231, 247 (2025).

To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong Strickland test showing: (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) "the deficient performance

prejudiced the defense." Strickland, 466 U.S. at 687; accord Fritz, 105 N.J. at 58.

Under the first prong, a defendant must show counsel's performance fell below "an objective standard of reasonableness." State v. Marshall, 148 N.J. 89, 156-57 (1997). In doing so, the defendant must overcome the strong presumption that counsel "rendered adequate assistance." State v. Balbosa, 481 N.J. Super. 497, 520 (App. Div. 2025) (quoting Strickland, 466 U.S. at 690).

Under the second prong, a defendant "must show that [counsel's] deficient performance prejudiced [his] defense." State v. O'Neil, 219 N.J. 598, 611 (2014) (quoting Strickland, 466 U.S. at 687). This showing is more difficult; it requires the defendant to show a "reasonable probability that, but for counsel's [] errors, the result of the proceeding would have been different." Gideon, 244 N.J. at 551 (quoting Strickland, 466 U.S. at 694).

The defendant bears the burden of proving both prongs of the Strickland test by a preponderance of the evidence. State v. Gaitan, 209 N.J. 339, 350 (2012). "Unless both parts of the test are established, defendant's claim must fail." State v. Echols, 199 N.J. 344, 358 (2009); State v. Parker, 212 N.J. 269, 280 (2012).

Defendant argues trial counsel was ineffective because he did not argue the shooting of Burgos did not occur during a robbery and, therefore, was not felony murder. He asserts a reasonable jury could have found that the altercation with Young was an extension of the earlier dispute with Young and, therefore, Burgos was not shot during a robbery. Thus, he contends trial counsel's ineffective performance deprived him of a "complete" defense and led to his felony murder conviction.

The record amply supports the PCR court's findings and conclusions that defendant failed to show that his trial counsel was ineffective or that defendant was prejudiced. Several witnesses testified that defendant demanded money of Young when he confronted him on the day of the shootings. That testimony was strong evidence from which a jury could find that defendant was attempting to commit an armed robbery when he shot and killed Burgos. Thus, defendant has not shown that his trial counsel made an error so serious that he was not functioning as reasonable counsel. Moreover, even if trial counsel had made the argument, the record does not demonstrate that defendant was prejudiced because the argument would have been inconsistent with the testimony of several witnesses. Consequently, we affirm the order denying defendant's PCR petition.

In summary, we affirm defendant's convictions but remand for a new sentencing.  We affirm the order denying defendant's PCR petition.

Affirmed in part and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division